## CHICAGO, R. I. & P. RY. CO. v. MARTIN.

No. 3707.   Opinion Filed May 12, 1914.

Rehearing Denied June 16, 1914.

(141 Pac. 276.)

1. **RAILROADS—Injuries to Persons on Track—Question for Jury.** In an action against a railroad company for damages charged to have been sustained by its negligence, the testimony of the plaintiff was that he was injured while standing about eighteen inches from the west rail of the tracks, and was struck by the engine, or some part of it; and the engineer in charge of the train testified that he saw the plaintiff when seventy-five feet from the west rail and in the clear, and the next time he saw him he was ten feet in front of the engine running toward the rails, and he was struck just as he crossed the west rail. Such testimony raises an issue of fact as to whose negligence—that of the plaintiff or that of the company—was the proximate cause of the injury, and this issue was properly submitted to the jury.

2. **APPEAL AND ERROR—Harmless Error—Submission of Issues.** Where, in such action, testimony is admitted without objection tending to show that the accident might have been avoided by the exercise of proper care by the servant of the defendant, after he discovered the peril of the plaintiff, it is not prejudicial error for the court to submit to the jury the issue raised by such testimony, although this issue was not raised by the pleadings.

3. **RAILROADS—Accident to Person on Track—Evidence.** In such action a municipal ordinance, limiting the speed of trains within the city limits, was admitted for the purpose of showing the violation of the terms of the ordinance by the defendant, as an element tending to establish actionable negligence. **Held,** that this evidence was competent although not pleaded.

(Syllabus by Galbraith, C.)

*Error from District Court, Caddo County;*
*Frank M. Bailey, Judge.*

Action by Evan C. Martin, a minor, by his next friend, H. L. Martin, against the Chicago, Rock Island & Pacific Railway Company.   Judgment for plaintiff, and defendant brings error. Affirmed.

*C. O. Blake, H. B. Lowe, R. J. Roberts,* and *W. H. Moore,* for plaintiff in error.

*Bond & Melton,* for defendant in error.

Opinion by GALBRAITH, C.   The plaintiff in error appeals from a judgment in the sum of $2,500, rendered against it upon the verdict of a jury in favor of the defendant in error, in an action for personal injuries alleged to have been sustained on account of the negligent operation of one of its passenger trains.   The charging part of the petition is as follows:

"Second.   That on or about the 31st day of July, 1910, the plaintiff, Evan C. Martin, was at the passenger depot of the defendant railway company in the city of Chickasha, Okla., and purchased a ticket from the agent of said company, intending to become a passenger on said company's railroad; that about 1 o'clock at night, plaintiff left said depot and went north about 100 feet along and near the main line of track of said company in a footpath used by a great many persons going to and from said depot, and, while the plaintiff was standing in said footpath along and near said track, at a place about 100 feet north of said passenger depot, an engine with passenger cars attached came along said track from the north, which engine was at that time being operated and controlled by the servants and employees of said defendant company; that said engine and train, although nearing said passenger depot in said city of Chickasha, and in the yards of said defendant railway company, was running at a high rate of speed with no audible noise or signals of any kind; that no bell was rung, no whistle blown, nor any other signal or noise of any kind given or made to warn of the approach of said train; that plaintiff was not aware of the approach of said train until he heard some one remark, 'There comes a train,' when the plaintiff turned to see from what direction the train was coming, and the engine driven and controlled by the servants and employees of defendant company struck the plaintiff and inflicted various and painful injuries, broke the plaintiff's left foot immediately below the ankle joint; and that, as the result of such injuries, plaintiff suffered great physical and mental pain, anguish, and distress to his damage in the sum of $20,000.

"Third.   Plaintiff alleges that the place where he was standing when such injuries were inflicted upon him by said engine was at said time, and had been for a number of years prior thereto, used by a great many persons and by the general public as a footpath to and from the passenger and freight depots of the defendant railway company in said city of Chickasha, and a great many persons passed along such footpath both day and night, all of which was well known to the defendant; and said defendant, its servants and employees in charge of said engine and

train well knew that people in considerable numbers passed along and near said track, both day and night, and it was the duty of said defendant, its servants and employees to keep a lookout for people at such place and to give audible signals and warnings of the approach of trains, and to reduce the speed of the trains to prevent injury to persons who might be along and near said track, but that said defendant and its servants and employees in charge of said engine and train at said time, as hereinbefore alleged, carelessly and negligently failed to give any signals or warning of the approach of said engine and train, as hereinbefore alleged, and failed and neglected to reduce the speed of said train in order to prevent injury to persons who might be in and along said track, and, by reason of such carelessness and negligence of said defendant, its servants and employees, said engine was run against the plaintiff, and plaintiff suffered injuries thereby, as hereinbefore alleged, without fault on the part of the plaintiff."

The answer was a general denial and the affirmative plea of contributory negligence. A reply was filed denying the affirmative defense.

The accident occurred in the yards of the plaintiff in error at Chickasha, about 100 feet north of its passenger depot, and a short distance south of its freight depot. The plaintiff's evidence tended to support the allegations of his petition, and showed that the place where the accident occurred was used by the public in crossing from the main part of town to the manufacturing plants located on the east side of the tracks, and that for many years a great many persons had been accustomed to cross the tracks at this point at all hours of the night and day, and that two of plaintiff in error's trains were accustomed to stop at or near this point to discharge and take on passengers. The plaintiff's testimony as to how the accident occurred is as follows:

"Q. How long had you been in Chickasha? A. I run in there from Bradley between six and seven o'clock, and I had been over there between one and two o'clock when I was struck. Q. Where were you when you were injured? A. North of the platform; 120 feet the man said that measured it. Q. What depot? A. Rock Island depot at Chickasha; the old depot. Q. Passenger depot? A. Yes, sir. Q. How long had you been at this place north of the depot before you were injured? A. Three or four minutes. Q. Was any one else close there? A. Yes, sir;

Wiseley and Nicewander. Q. Did you know him at that time? A. No, sir; that was the first time I ever seen him. Q. Did you learn his name then? A. No, sir. Q. What position did you have when you were injured? A. Facing kinder to the southeast; facing the depot more than I was east a whole lot. Q. Where was Wiseley and the other man standing? A. Standing back northwest of me. Q. Did you have a grip? A. Yes, sir. Q. What did you do with the grip? A. Set it down by me. Q. When? A. When I walked up there and Charlie and this man were talking. Q. Where did you set the grip in reference to the main line? A. It must have been in three feet of the west rail of the main line. Q. Where were you standing? A. Between the grip and the main line. Q. About how far were you standing from the west rail of the main line? A. A foot and a half or two foot; about the end of the ties. Q. What first attracted your attention to the train? A. I cannot hardly say as to that; but I must have heard a little noise of the train and I looked around, and it must have been in five or six feet of me the first I knew of the train. Q. Was the bell ringing? A. No, sir. Q. Was the whistle blowing? A. No, sir. Q. Was there any noise of any kind of the approach of the train? A. No, sir; no noise of any description. Q. What was done when you first noticed the train? A. The first thing that I done was to try to get my mind together and get out of the way, and it was so close to me that I did not realize the position I was in until I was knocked down. Q. Where were you hit? A. In this arm, and this shoulder was skinned, and this hip was skinned, and this foot was cut off. Q. What time of night did that occur? A. Between one and two o'clock. Q. Did you know anything about the train coming in at that time? A. No, sir; I did not know a train was coming from the north at all. * * * Q. What were you doing at the depot that night? A. We went there that night and bought a ticket to Minco, and was intending to go and missed the train. Q. That was early in the evening? A. Yes, sir. Q. When did you go back to the depot? A. About one o'clock. Q. What time did the accident happen? A. I heard some one say that it was about 1:30. Q. Shortly after you went back to the depot? A. Yes, sir. Q. Who was with you? A. Wiseley. Q. Where were you and Wiseley going? A. Intended to go to Minco, and we stepped north of the platform to get out of the crowd, and talked, and we met this man. Q. Were many people about the depot? A. Yes, sir; that's how come us to go up there; to get out of the crowd."

And on cross-examination he testified in part as follows:

"Q. How far did you walk north before you stopped after you met Nicewander? A. I don't think we walked at all. Q. You think you stopped right there where you met Nicewander? A. Yes, sir; I believe, too, he did follow Charlie a few steps; ten or twelve. Q. What made you stop? A. I·seen Charlie was going to get into a conversation with him, and something called my attention back to the depot. Q. You heard Charlie say here that you and Nicewander did the talking? A. No, sir; I don't remember it that way; I know I did not talk to him any. Q. What was the first noise you heard there? A. I cannot say; I think some noise of the engine. Q. And you looked around and it was right on you? A. Yes, sir. * * * Q. You were standing up there in the dark; what were you ·doing that for? A. Waiting until Charlie got through talking to that fellow. Q. When did you first realize you were standing in two or three feet of the main line? A. I was bound to be standing there if I did not move and the ·thing hit me. Q. You have no recollection at this time as to where you were standing, but you think you were standing that close because the train hit you. A. Yes, sir."

There was a demurrer to the plaintiff's evidence on the ground that the same was insufficient to sustain a judgment against the defendant.

This demurrer was properly overruled, since there was sufficient evidence offered by the plaintiff to take the case to the jury on the issues formed by the pleadings of the negligence of the company and the contributory negligence of the plaintiff. The railway company, in support of its affirmative defense that the contributory negligence of the plaintiff was the proximate cause of the injury, and to excuse it from the primary liability of negligence charged against it, among other witnesses, introduced the engineer in charge of the train, who testified, in part, as follows:

"Q. How long have you been employed by that company? A. A little over nineteen years. Q. How long have you been in the railroad business? A. Nineteen years. Q. You have not worked for any other company? A. No, sir. · Q. Were you engineer on No. 11 on the 31st day of July, 1910, when the plaintiff in this case was struck in the yards at Chickasha? A. Yes, sir. Q. Tell the·jury what you saw of that accident that night; where the plaintiff was and what he did, if you saw him, and what efforts, if any, you made to avoid striking him; begin with the time you signaled for the Frisco crossing north. A. I gave two short blasts of the whistle for the crossing, and before I got to

the crossing I gave one long one, and I stopped and gave two short ones, and started the bell to ringing, and stopped half way between Line Creek bridge and the switches I blew another long one. Q. What was that for? A. For the station. Q. What kind of bell did you have? A. An automatic bell; worked by air. Q. Where did you start that bell ringing? A. At the Frisco; you turn a valve inside of the engine, and when you want it stopped you turn it off. Q. When did you stop the bell from ringing? A. Didn't stop at all. Q. Until when? A. I believe I kept it ringing all the time. Q. It is not ringing now? A. No, sir. Q. Was it ringing when you struck the plaintiff? A. Yes, sir; and it was still ringing when we stopped there. Q. How long did it ring after you struck the boy? A. It kept ringing until we got to the depot and stopped at the depot. Q. Did you have the headlight burning that night? A. Yes, sir. Q. What speed were you making as you came through the yards? A. About fifteen miles an hour. Q. Were you making steam? A. No, sir. Q. When did you cut the steam off? A. As I whistled for the station. Q. North or south of Line Creek bridge? A. South of the bridge. Q. How far south? A. About half way between the bridge and the switches. Q. Where did you first see the plaintiff? A. About 75 feet from them; they were standing about eleven feet from the track; three of them. Q. What occurred then? A. They stood there, and as I came along one run in front of the engine, and I did not have time to do anything before the engine hit him. Q. How close were you to him when he started to run? A. About ten feet from him. Q. What part of the engine struck him? A. The pilot. Q. Did he get across the rail? A. Just going across. Q. Which way did you knock him? A. West. Q. What effort did you make to stop the train after you saw him start across the track? A. I put the air on and pulled the whistle at the same time. Q. What kind of signal did you give with the whistle? A. Short whistles; short distress signals. Q. How far did your train travel after you struck the man? A. The mail car and about one-half of the passenger coach. Q. How many feet is that? A. I think the cars are 60 feet long; 50 or 60. Q. The engine and the tender, the baggage car, and about half of the first coach? A. Yes, sir. Q. What did you do then? A. I got off and went back there. Q. What did you do when you got back there? A. They got a stretcher out of the baggage car and put the boy on the stretcher and carried him to the baggage room. Q. At the time you saw these three men standing by the track where were they? A. On the end of the ties of the coach track. Q. Did you have time to stop your train and

avoid striking the plaintiff after you saw his danger? A. No, sir; I did not have any time at all. Q. How much time did you have from the time you saw him until you struck him? A. He was going across the front rail when I hit him, and he was running then. Q. You applied the air? A. Yes, sir; and pulled the whistle and stopped the train right there."

On cross-examination he testified, in part, as follows:

"Q. You were behind time? A. Yes, sir. Q. Making up time? A. Not from the crossing, but I was making up time that night. * * * Q. Fifteen miles an hour; you were not running any slower than that? A. About fifteen miles an hour. Q. Fifteen miles an hour is a pretty good speed to run an engine by a station where there are passengers about the station? A. No, sir. Q. It is not fast? A. No, sir. Q. If you had been running at eight miles an hour you could have stopped the train, and the boy would not have been injured? A. No, sir. Q. At the time you saw the boy how far was he from you? A. About 75 feet. Q. Did you see his grip? A. No, sir. Q. If you had applied the air when you first saw them you could have stopped? A. Yes, sir; if I had known he was going to cross the track. Q. If you had done that there would have been no injury? A. No, sir; not if I had stopped. * * * Q. There was a crowd of people on the depot platform? A. Yes, sir; always is. Q. About 100 feet from the boys? A. Yes, sir. Q. You were watching them? A. Yes, sir; all around. Q. And you saw these boys standing there? A. Yes, sir. Q. Do you know which one was standing nearest the track? A. No, sir. Q. Didn't pay any attention to them? A. No, sir; they were in the clear. Q. You thought they were in the clear? A. They were. Q. That is your judgment; you calculated they were in the clear? A. I know they were in the clear. Q. You saw them there together when you were 75 feet of them? A. Yes, sir. Q. And you concluded they were in the clear? A. Yes, sir. Q. And you paid no further attention to them? A. Not until the boy run. Q. And you were in ten feet of him then? A. Yes, sir. Q. Did he run across from near the other track where he was and across the first rail of the track you were on while you were going ten feet? A. He was in ten feet of the engine when I seen him going on the track. Q. How far over the track did he get? A. Just stepped over the first rail. * * * Q. Just ran in front of the engine? A. I had something else to watch besides them after I saw they were in the clear. Q. You saw three men there, and paid no further attention to them until you saw the boy hit? A. Until I saw him going to the track. Q. The pilot hit him? A. Yes, sir.

\* \* \* Q. If when you first saw the three men, if at that time your judgment had told you that either of them were in danger of being hit, you would have stopped the train? A. Yes, sir. Q. But your judgment was they were not close enough to be hit? A. Yes, sir."

On redirect examination this witness testified:

"Q. When you first noticed the people they were standing some ten or eleven feet to the side of the track and in the clear? A. Yes, sir. Q. And you were 75 or 80 feet from them then? A. Yes, sir. Q. And the next time you saw this boy he was ten feet in front of the engine and going on the track? A. Yes, sir. Q. Was there anything in their actions when you first saw them to indicate to you that it was their intention to cross in front of you? A. No, sir."

On recross-examination he testified:

"Q. You saw them there and paid no further attention to them? You paid no attention to what they were doing? A. They were standing there; standing still."

At the close of the evidence the plaintiff in error again demurred to the evidence. This was properly overruled by the court for the same reason given for denying the demurrer to plaintiff's evidence. The motion for an instructed verdict for the defendant was likewise denied, and properly so, for the reason that there was sufficient evidence of negligence of the plaintiff in error, and also of contributory negligence of the defendant in error, to send these issues to the jury.

Complaint is made that the court erred in permitting a certified copy of an ordinance of the city of Chickasha to be introduced in evidence over the objection of the plaintiff in error. This ordinance prohibited railroad trains within the city limits from running at a greater speed than eight miles an hour. The purpose of its introduction was to show that the train which caused the injury was being operated at a greater speed than the ordinance allowed and in violation of its terms. It is argued by the plaintiff in error that this ordinance was not competent, for the reason that no predicate for such evidence had been laid in the petition. The plaintiff's cause of action was not based upon the ordinance. The evidence was competent for the purpose of showing the violation of the ordinance as an element tending to

establish the negligence of the railway company, charged against it in the petition, and it was not necessary that a predicate for the evidence should have been made by plea in the petition in order to render it admissible.   The rule is announced in Thompson's Law on Negligence, vol. 6, par. 7868, as follows:

"Where the evidence tends to show that a particular act was prohibited by ordinance, and that such violation contributed to the injury, then the ordinance is properly admitted on the question of negligence, though not pleaded; but the rule is otherwise where the action is founded on a violation of the ordinance, and here it is necessary to plead the ordinance."

This rule is supported by a great array of authorities cited in the note.

Exceptions were taken to a number of the court's instructions to the jury, and these have been argued at length in the briefs, but it does not seem necessary to discuss these exceptions at length, since counsel admit in their brief that they correctly state the law, but contend that they were not applicable to the issues when applied to the evidence.   With this contention we cannot agree.   Aside from the request for an instructed verdict for the railway company, it does not appear that counsel for either party requested special instructions.   The instructions all seem to have been given by the court of its own volition.   Considered together, the instructions were clear, full, and fair, and cover the issues raised by the pleadings and the evidence.   We find no legal objections to any one of them.

Counsel for plaintiff in error insist that giving instruction No. 11 was prejudicial error, since there was no issue raised by the pleadings that would warrant or justify this instruction.   This instruction embodied a statement of the last clear chance or discovered peril doctrine.   The Supreme Court of Missouri has held that the allegations in the petition of the negligent management of the train was sufficient to authorize such instruction.   *Hanlon v. Missouri P. Ry. Co.*, 104 Mo. 381, 16 S. W. 233.   Under our decisions this instruction was justifiable, although the issue it covers was not made by the pleadings, but was raised by the evidence admitted during the course of the trial, the evidence being

admitted without objection. *Railway Company v. Baker,* 21 Okla. 51, 95 Pac. 433, 16 L. R. A. (N. S.) 825; *Railway Company v. Spears* 31 Okla. 469, 122 Pac. 228; *St. Paul Ins. Co. v. Griffin,* 33 Okla. 178, 124 Pac. 300. In the instant case this issue was introduced by the plaintiff in error and by the testimony of the engineer set out in the early part of this opinion. This evidence having been admitted without objection, it became the duty of the trial court to submit the issue raised by it to the jury by proper instruction. This was done. The exceptions are not well taken.

We cannot assent to the contention that the defendant in error was a mere trespasser, and that the company owed him no duty except that it should not wantonly and recklessly run him down. He was doubtless negligent in looking after his own safety, and the company was doubtless negligent in the management of its train at and near the place of the accident. Martin was at a point in the company's yards where its employees in charge of its trains had reason to expect persons at any hour of the day or night. The law imposed the duty upon them of using reasonable care to avoid injury to such persons. Whose negligence was the proximate cause of the accident was a question for the jury. It may have found that Martin was negligent, and that, notwithstanding his negligence, if the engineer in charge of the train had used reasonable care and slowed down and kept his engine under proper control and given proper warnings after he saw Martin 75 feet in front of the engine, he could have avoided the injury, and his failure to do this was actionable negligence. The evidence would have supported any one or all of such findings. *A., T. & S. F. Ry. Co. v. Cogswell,* 23 Okla. 181, 99 Pac. 923, 20 L. R. A. (N. S.) 837; *A., T. & S. F. Ry. Co. v. Jandera,* 24 Okla. 106, 104 Pac. 339, 24 L. R. A. (N. S.) 535, 20 Ann. Cas. 316; *Metropolitan R. Co. v. Fonville,* 36 Okla. 76, 125 Pac. 1125; *St. L. & S. F. R. Co. v. Kral,* 31 Okla. 624, 122 Pac. 177.

A careful examination of the record in this case convinces us that the issues arising under the pleadings and the evidence

were fairly submitted to the jury under proper instructions as to the law, and we see no reason for disturbing the verdict returned thereon.

We therefore recommend that the exceptions be overruled, and that the judgment appealed from be affirmed.

By the Court:    It is so ordered.