## MISSOURI, O. & G. RY. CO. v. PARKER.

No. 5443. Opinion Filed June 1, 1915.

Rehearing Denied August 3, 1915.

(151 Pac. 325.)

1. **NEGLIGENCE—Comparative Negligence.** The doctrine of "comparative negligence" does not obtain in this state.

2. **APPEAL AND ERROR—Railroads—Review—Harmless Error—Crossing Accidents—Instructions.** It is error for the court to instruct the jury that under the statute it was the duty of the railroad company to ring the bell "and" blow the whistle of the engine 80 rods from the crossing; but where it was evident, even though so instructed, that the jury was not misled thereby, nor any of the rights of the defendant prejudiced thereby, it will be held to be harmless and not reversible error.

3. **TRIAL—Instructions—Evidence.** Where it is evident that plaintiff has introduced evidence to support his theory of the case, it is not error for the court, after telling the jury what plaintiff's theory of the case is, to then tell them that he has introduced evidence to support it.

4. **SAME—Issues.** It is the duty of the court to instruct upon the doctrine of "last clear chance," even though not raised by the pleadings, when it is raised by evidence admitted during the course of the trial.

5. **RAILROADS—Crossing Accidents—Evidence.** Evidence examined, and **held,** that the doctrine of "last clear chance" was raised thereby and properly submitted to the jury.

6. **DAMAGES—Personal Injuries—Measure.** A verdict for $10,000 held to be grossly excessive.

(Syllabus by Mathews, C.)

*Error from District Court, Hughes County;*
*John Caruthers, Judge.*

Action by George R. Parker against the Missouri, Oklahoma & Gulf Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed conditionally on remission of part of the recovery.

*E. R. Jones, J. C. Wilhoit,* and *Arthur Miller,* for plaintiff in error.

*Geo. C. Crump* and *J. L. Skinner,* for defendant in error.

Opinion by MATHEWS, C. 1. This is an action for damages for personal injuries alleged to have been sustained by defendant in error on account of the negligence of plaintiff in error in the operation of its engine on its road at a public crossing in the town of Calvin, Hughes county. The plaintiff in error answered the petition of defendant in error by a general denial and the affirmative plea of contributory negligence. At the trial, the jury returned a verdict for defendant in error for $14,000, a *remittitur* of $4,000 was ordered by the court, and, the same having been done, the motion for a new trial was overruled, and the plaintiff in error brings the case here on appeal. The parties will be designated as in the trial court.

The defendant does not complain of the sufficiency of the petition, nor of any ruling of the court upon the admission of testimony, but reserved exceptions to a large

number of the court's instructions, and also excepted to the court's refusal to give a number of instructions offered by the defendant, and also urges that the verdict was excessive.

2. Instruction No. 1 is as follows:

"The court instructs you, gentlemen of the jury, that the mere fact that the plaintiff has been injured on the street crossing in the town of Calvin by an approaching switch engine of the defendant company would not of itself entitle plaintiff to recover, nor show negligence on the part of the defendant company; but the plaintiff must go further and show by a fair preponderance of the evidence every material allegation of his petition, and that his injuries, if any were caused by the defendant's negligence in the operation of the switch engine along the public thoroughfare, in failing to give proper signal, and in running at an unusual rate of speed, and as the direct, approximate result of the defendant's negligence in the operation of said engine, plaintiff was hurt, and that said hurt was not the result of the plaintiff's own carelessness and negligence in failing to use due caution and care on its own part to stop, look, and listen for the approaching engine, and the burden is also upon the plaintiff to show by competent evidence where he has been injured and the extent thereof in order that the jury may intelligently assess his damages if they find plaintiff is entitled to prevail.

"By a 'fair preponderance of the evidence' the court does not mean necessarily the largest number of witnesses who may have testified in the case as to any given controverted fact, but that greater weight of the evidence, which, after a full and candid consideration of all the evidence, satisfies and convinces your judgment of the truth of the plaintiff's contention."

We think this instruction correctly states the law and cannot find that it assumes that plaintiff has been injured, as complains defendant, or that there appears therein

any assumption that defendant was negligent in the operation of its switch engine; but the intent of this instruction was to inform the jury where the burden of proof lay and the extent thereof.

3.   Instruction No. 2 is as follows:

"The court further instructs you that the plaintiff and the defendant both had a right to use the streets in the town of Calvin where the accident is alleged to have happened.   It was likewise the duty of both to exercise reasonable care to avoid the collision, but it was not the duty of the defendant to exercise a higher degree of care than the plaintiff, nor was it the duty of the plaintiff to exercise a higher degree of care than the defendant.   It was the duty of each, acting in his own place, under the circumstances surrounding each—that is, plaintiff and the defendant's employees in charge of the switch engine —to exercise that degree of care to avoid any accident which a reasonably prudent person would have exercised under the circumstances.   If defendant's negligence is the proximate cause of the injuries, then it is liable for damages.   If the plaintiff's negligence and the defendant's negligence are equal, it cannot be said that the defendant's negligence is the proximate cause, and therefore the plaintiff would not be entitled to recover.   And in this case, if the plaintiff and the defendant's employees in charge of the engine, with equal negligence, approached each other on the highway and an injury resulted to the plaintiff from the collision, then there can be no recovery for the reason it cannot be said that the negligence of either is the proximate cause of the injuries of the other.

"It is the plaintiff's theory in this case, in support of which he has offered evidence, that he was going to the Rock Island Railroad depot, and that before going upon the track of defendant's railroad he stopped and looked and listened, and that because of the obstruction of a high bank on the east side of the street he could not see the approaching engine as it was backing west; that he never heard the whistle blow or the bell ring; that in

the exercise of due care and caution he proceeded to cross the track and while doing so, because of the failure of the defendant's agents and employees to give any signal of the approaching engine, and to exercise ordinary care to avoid collision, his wagon was struck and he was knocked or thrown out of the same or forced to jump therefrom; and that at the time defendant's engine struck the wagon in which he was riding and caused the injuries he complains of.

"If you find by a fair preponderance of the evidence that this contention is true, and that as a result of the failure of the engineer to ring the bell and sound the whistle before crossing the street, and to apply the emergency brakes after plaintiff was discovered by the engineer, or apprised of the fact of his presence by his brakeman or other employees, in time to stop the train, provided that in the exercise of ordinary care and caution the defendant could have stopped the train and prevented the accident, and but for which negligence on the part of the defendant's employees the accident would not have happened, and you further find that the plaintiff's injuries were not due to his own lack of care in seeking to avoid the collision with the train by first stopping, looking, and listening before going upon the track, then you should find for the plaintiff."

Defendant complains that this instruction is too comprehensive, and insists that the court therein attempts to cover the law relative to the negligence of the defendant, contributory negligence, comparative negligence, and the doctrine of last clear chance, and also to state the theory of the case from the plaintiff's side.

The practice of embracing several subjects in the same paragraph of the charge is not to be commended, and the best procedure is not to mix different propositions in the same paragraph unless closely related; but this is a question of taste only, and error cannot be predicated thereon.

But the prime complaint raised against this part of the instruction, which presents the most difficult question in the case, is the contention that the court therein gives an instruction on the doctrine of comparative negligence. That part of the instruction so complained of is as follows:

"The court further instructs you that the plaintiff and the defendant both had a right to use the streets in the town of Calvin where the accident is alleged to have happened. It was likewise the duty of both to exercise reasonable care to avoid the collision, but it was not the duty of the defendant to exercise a higher degree of care than the plaintiff, nor was it the duty of the plaintiff to exercise a higher degree of care than the defendant. It was the duty of each, acting in his own place, under the circumstances surrounding each—that is, plaintiff and the defendant's employees in charge of the switch engine —to exercise that degree of care to avoid any accident which a reasonably prudent person would have exercised under the circumstances. If defendant's negligence is the proximate cause of the injuries, then it is liable for damages. If the plaintiff's negligence and the defendant's negligence are equal, it cannot be said that the defendant's negligence is the proximate cause, and therefore the plaintiff would not be entitled to recover. And in this case, if the plaintiff and the defendant's employees in charge of the engine, with equal negligence, approached each other on the highway, and an injury resulted to the plaintiff from the collision, then there can be no recovery for the reason it cannot be said that the negligence of either is the proximate cause of the injuries of the other."

It is apparent that the court prepared the above in line with the case of *Oklahoma City Ry. Co. v. Barkett*, 30 Okla. 28, 118 Pac. 350, and it appears to have been taken therefrom. If the contention of defendant be true that the court has so instructed the jury on the doctrine of comparative negligence and asked them to apply it

in this case, then it would follow that a serious error was committed, because this court has placed the matter beyond controversy in holding that the doctrine of comparative negligence does not obtain in this state. *Hailey-Ola Coal Co. v. Morgan*, 39 Okla. 71, 134 Pac. 29; *St. Louis & S. F. R. R. Co. v. Elsing*, 37 Okla. 333, 132 Pac. 483.

The instruction in the case of *Hailey-Ola Coal Co. v. Morgan, supra,* upon which that case was reversed as presenting to the jury the doctrine of comparative negligence, is as follows:

"If, after an entire consideration of all the evidence, you are satisfied that the plaintiff by reason of his own negligence contributed to his injury, but that said injury was not the direct, proximate, and immediate result of the plaintiff's negligence, but, on the other hand, you believe by a fair preponderance of the evidence that the injury was caused by defendant's failure to provide a safe place, and suitable and safe structure in which plaintiff was to work, then the court instructs you that the contributory negligence on the part of the plaintiff would not exonerate the defendant and disentitle the plaintiff from recovery, but would go in mitigation of damages, and you should consider this fact, if such you find to be the fact, in fixing the amount to be awarded to the plaintiff."

The instruction to the same effect which resulted in the reversal of the case of *St. Louis & S. F. R. R. Co. v. Elsing, supra,* is as follows:

"But notwithstanding you may find that the plaintiff was standing in violation of the rules of the company which had been called to his attention, when the caboose was struck, yet if you find by a fair preponderance of the evidence that the alleged injury to the plaintiff was caused by the careless and negligent management of the freight train on the part of the defendant's agent and

50—17

employees * * * was the immediate, proximate cause of the plaintiff's injuries, the plaintiff's right of recovery would not be denied him, but you can take his action in this regard in deciding whether his conduct contributed to his injury, and in mitigation of the amount of damages he is entitled to recover."

It is plainly apparent that the court instructed the jury in each of these cases under consideration that the plaintiff was permitted to recover notwithstanding the jury might find that he had been guilty of negligence, his conduct in that regard to be considered by the jury in mitigation of the amount of damages allowed by the jury. This court, in the Hailey-Ola Coal Co. Case, uses the following language:

"This instruction is a statement of the rule of comparative negligence. The court, by this instruction, in effect told the jury that, even though plaintiff's negligent acts contributed to his injury, yet that fact would not bar his recovery, if the defendant was also negligent, but that they might consider his acts of negligence in mitigation of damages to be awarded."

But we are unable to see this vice in the instruction complained of, and nowhere therein does the court tell the jury that they may find for the plaintiff even though they might find that he was guilty of negligence. The first paragraph of this instruction, and that part which defendant claims presents the comparative negligence doctrine, is more a dessertation by the court upon the rights and relative duties of plaintiff and defendant in using the street. It served to give the jury a clearer idea of the duty of each to the other as well as the right each had there. Much of it could have been left out of the instruction without detracting therefrom, but it was entirely proper to place it therein, should the court so desire. Nowhere therein does it appear that the court tells the

jury that any fact or circumstance connected with the entire case should, or could, be considered by them in mitigation of damages. In fact, it will be observed that at the end of this instruction the court impresses upon the jury that they cannot find for the plaintiff **unless** they find from a fair preponderance of the evidence:

"That the plaintiff's injuries were not due to his own lack of care in seeking to avoid the collision with the train by first stopping, looking, and listening before going upon the track."

It is possible even that the court placed a greater burden upon the plaintiff than the law permits when he instructed that, before they could find for plaintiff, they must first find that he "stopped, looked, and listened." The courts have uniformly held that a person must always "look and listen" before going upon a railroad track crossing, but it appears that he is not required to "stop," unless the jury should first determine that persons of ordinary care and caution in the same or similar s tuation would have "stopped" before proceeding across. *Chicago, R. I. & P. Ry. Co. v. Baroni,* 32 Okla. 540, 122 Pac. 926.

It is obvious, from an inspection of the court's instruction, that he fully understood the rule in this state that the plaintiff could not recover if any contributory negligence upon the part of the plaintiff appeared in the evidence, and he so repeatedly instructed the jury.

In instruct on No. 4 appears the following:

"The court further instructs you if the injury plaintiff complains of was the direct and proximate cause *(sic)* of his own negligence in failing to exercise ordinary care and prudence to avoid the injury, that is to say, want of such care as an ordinary prudent person would have exercised under like circumstances in the situation where

he found himself, taking into consideration the dangerous character of the railroad crossing, he cannot recover."

Even though the contention of attorneys for the defendant is correct that the court did instruct the jury squarely upon the doctrine of comparative negligence and there told the jury that if they found that both plaintiff and defendant were negligent, the plaintiff still could recover notwithstanding he was guilty of contributory negligence, and that if they found for plaintiff under these circumstances, they should consider the negligence upon the part of the plaintiff in mitigation of the amount of damages, we are quite sure that counsel for defendant will agree entirely with us that this instruction was harmless and did not influence the jury in the least, because they strenuously insist, and there seems to be merit in their contention, that the jury in their verdict lavished largesses upon the plaintiff in full, heaped, and rounded measure, and that there cannot be gleaned therefrom the slightest evidence that they were influenced by the doctrine of comparative negligence; the size of the verdict not indicating that it had been scaled down by the jury. In returning a verdict of the size they did, it is apparent that they absolved the plaintiff of all negligence, and the doctrine of comparative negligence, if given by the court, did not influence them in arriving at their verdict.

The defendant next complains of the instruction wherein the court was instructing the jury upon the statute relative to the duty of the defendant to either ring its bell or blow the whistle 80 rods from all crossings, wherein the court said it was the duty of the defendant under such conditions to ring the bell "and" blow the whistle.

It will be conceded, without argument, that the court should have instructed the jury that defendant's duty was to ring the bell "or" blow the whistle. The statute does not require both the ringing the bell and blowing the whistle, and in this particular the court was in error. But will any one say that it was prejudicial error? Common sense should enter into the decision on such propositions as this and govern when reason points but one way. Even though the court has inadvertently used "and" where he should have used "or," would it be possible to find a juror in the state who for a moment would be misled thereby and conceive it to be the duty of the defendant both to ring the bell and blow the whistle? The question answers itself. No harm results from the error, and, if this court should make a practice of reversing cases on such technical objections, it would be truly difficult to find a case that could stand the test. Besides, "and" is often used for "or," and it takes no strained construction to see that intent here.

Defendant, in further complaint of this paragraph of the court's instruction, says that the court has assumed that the engineer did not ring the bell or sound the whistle, and therein also instructed that if the jury should believe that the plaintiff did not hear the whistle blown or the bell rung he might recover notwithstanding they might believe from the evidence offered in the case that the whistle was blown and the bell rung.

An analysis of this part of the instruction dispels both of these objections urged here. The court told the jury that it is plaintiff's theory in this case, "because of the failure of the defendant's agents and employees to give any signal of the approaching engine and to exercise ordinary care to avoid collision," he was injured,

and then proceeds further in the same paragraph to instruct that, "if you find from a fair preponderance of the evidence that this contention is true," showing that the court did not assume anything, but simply told the jury what plaintiff was contending, and left it to the jury to say whether or not it was true, and instructed them rightly that, before they could find for the plaintiff, they must find, among other things, that plaintiff was injured as a result of defendant's negligence in failing to give any signal of the approaching engine. Neither do we think the court violated any rule in telling the jury that the plaintiff had introduced evidence to support his theory. It s too evident that he had done so to admit of controversy. The court expressed no opinion on the effect thereof, nor as to the weight the jury should give to it, nor as to the amount of evidence presented by the plaintiff, but left it all well within the province of the jury for their determination.

Defendant next urges that the court further erred in this paragraph of the instruction in submitting to the jury an instruction on the doctrine of "last clear chance," and urges that it was improper because facts were not set out in the pleadings that justify the reliance upon this doctrine by plaintiff.

The duty of the court to instruct under certain well-defined cond tions on this phase of the case, even though not raised by the pleadings, has been set at rest by this court in the case of *Chicago, R. I. & P. Ry. Co. v. Martin,* 42 Okla. 353, 141 Pac. 276, where we find the following:

"Under our decisions this instruction was justifiable, although the issue it covers was not made by the pleadings, but was raised by the evidence admitted during the course of the trial; the evidence being admitted without objection. *Railway Co. v. Baker,* 21 Okla. 51, 95 Pac. 433,

16 L. R. A. (N. S.) 825; *Railway Co. v. Spears*, 31 Okla. 469, 122 Pac. 228; *St. Paul Ins. Co. v. Griffin*, 33 Okla. 178, 124 Pac. 300. In the instant case this issue was introduced by the plaintiff in error, and by the testimony of the engineer set out in the early part of this opinion. This evidence having been admitted without objection, it became the duty of the trial court to submit the issue raised by it to the jury by proper instruction."

In the instant case the plaintiff introduced evidence to prove negligence on the part of the defendant in failing to give the proper signal of its engine's approach to the crossing. He also presented evidence to prove that he exercised due care and caution at the crossing. After he had rested his case upon this testimony, the engineer of the defendant road testified as follows:

"Q. What is your name? A. Robert Summers. Q. What was your business or occupation on January 9, 1913? A. Locomotive engineer for the Missouri, Oklahoma & Gulf Railway Company. Q. Just prior to the accident to the wagon or Mr. Parker, where had you been with the engine? A. We had been with the engine and one car east of town. Q. About a quarter of a mile east? A. About 1,000 or 1,200 feet, I suppose, from the depot. Q. When you went to the oil mill with the engine, then did you back toward the depot after you got through with your business at the oil mill? A. Yes, sir. Q. You say that is about 1,000 or 1,200 feet? A. Something like that. Q. What rate of speed were you going from the time you left the oil mill going down toward the depot? A. As near as I remember, just about six miles an hour. Q. State whether or not that is slow or rapid speed? A. That is ordinary slow speed in the incorporated limits of the town. Q. In your run back from the oil mill, did you sound the whistle? A. I sounded the whistle after I cut my switching and started back toward town. Q. Where is that switch, how far this side of the oil mill? A. I think it is about six car lengths from the west end of the oil mill. Q. Where

was the fireman? Who was the fireman? A. James Whitehead. Q. Was he with you on the engine? A. Yes, sir. Q. State, after you left the oil mill coming down toward the depot, what the fireman was doing? A. He was sitting on the side, it would be on the north side of the engine at that point pulling the bell rope. Q. Was he ringing the bell? A. Yes, sir. Q. When did he begin ringing the bell? A. As soon as we started from the switch. Q. How long did he continue ringing it? A. Until we stopped at the accident. Q. Continuously until you stopped at the accident? A. Yes, sir. Q. Now, do you know who else was on the engine, if any one, besides yourself and Mr. Whitehead? A. Yes, sir. Q. Who? A. Brakeman Sheeley was riding the pilot on the engine, and Brakeman Parker was riding the rear of the tender. There was a step on each side of the tender. Q. That would put Mr. Parker on the rear of the engine as you were coming down? A. Well, yes, on the right of the track as we were backing toward town. Q. And he would be on what you call the south side of the engine then? A. Yes, sir; he would be on the south side of the engine. Q. And Mr. Sheeley was on the north side of the engine? A. The east side of the engine, which in the pilot, riding on the step there that was provided for that purpose. Q. Did you see Mr. Parker and a wagon and team there as you neared the crossing? A. I saw the team as it came into view on the main street crossing. Q. When you saw the team, how far were you from it? A. I was right about 70 feet from the point that I stopped when I first saw the team. Q. What did you do when you saw it? A. I sounded the whistle and applied the brakes in the quickest possible manner. In other words, I used the emergency. Q. In what distance did you stop the engine? A. From the time I saw the danger until I stopped was between 70 and 74 feet, right about that. Q. Could you have in any way stopped the engine any sooner or less time than you did do it? A. I could not under the same circumstances. Q. How far was Mr. Parker from the railroad track when you first saw him? A. As well as I could judge, the team was

about, when I saw their heads come into view, was about 40 feet I judge from the south rail of the track. Q. Coming at what rate of speed, what sort of speed? A. Well, it was a good brisk walk, such as a team would, make in going down a steep grade with a wagon behind. Q. Now, Mr. Summers, did the engine strike the wagon? A. The rear of the tender struck the wagon. Q. About how far did it push the wagon after it struck it? A. Pushed it about six feet from the point it struck, maybe pushed it a few inches more, but right in the neighborhood of that, six feet. Q. Now, when you saw Mr. Parker in the wagon, which way was he looking? A. He was looking west toward the M., O. & G. depot. Q. Was that in the opposite direction from where you were? A. Yes, sir. Q. Did he at any time look east? A. After I sounded the whistle and called his attention, he looked east. Q. What did he do then? A. He tried to stop his team. Q. You say you sounded the whistle, what sort of sound, alarm did you give? A. I gave what you may call stock whistle. Q. What is that. A. A succession of short whistles. Cross-examination: By Mr. Crump: Q. How far is the oil mill from the crossing where you knocked the wagon off the track? A. Why, I could not state just exactly the number of feet, but it is not far, about somewhere in the neighborhood of 1,000 or 1,200 feet east of the M., O. & G. depot. Q. About a quarter of a mile from the crossing, isn't it? A. It is not quite. Q. Well, about? A. Yes, I expect it would be. Q. How many crossings between the oil mill and the M., O. & G. depot? A. Two. Q. You just whistled for one of them? A. Yes, sir. Q. How many times did you whistle for that one? A. I give the general regulation of whistles. Q. What is that? A. Two long and two shorts. Q. Were you working the steam when you came down behind that embankment? A. I cut it about between the two crossings. Q. Then you were not working the steam at the time the plaintiff was on the track? A. No, sir. Q. Just coasting before that? A. Yes, sir. Q. How many times did you whistle when you discovered Mr. Parker on the track or in danger? A. I don't re-

member the number of quick successions I sounded, gave the whistle, possibly four or five. I could not hold the whistle cord any longer than necessary to call his attention because I had other duties to perform to stop the engine. Q. I asked you how many times you whistled after you discovered him in danger? A. I cannot state. Q. About how many? A. Three or four. Q. Which hand did you use to blow the whistle with? A. The right hand. I was standing facing the rear. Q. Your back then was to the east? A. Yes, sir. Q. You then, after you got through blowing the whistle, had to turn around and work the throttle? A. No, sir. Q. How did you work it? A. I applied the emergency; the throttle was open. Q. You stated the throttle was already thrown open, where was the air situated? A. On the side below the throttle. Q. How far below the throttle? A. Well, now I never measured the distance, but it is about 12 or 13 inches. Q. How long is the air brake, I mean the lever that you work the air with? A. About 18 inches in length. Q. Did you reverse the engine? A. No, sir. Q. Just turned around and took hold of the emergency and pulled that on and stopped? A. Yes, sir. Q. Did you have to turn around to do that? A. I did not have to turn fully around. Q. And you backed right on when you were whistling? A. Yes, sir. Q. And reached up that way (indicating by counting four times), was it that fast? Was it as quick as that? A. It was quicker than that. Q. How far did you run when you were tooting? A. That is a pretty hard question to answer. Q. I know it, just give your best judgment. I don't want to split hairs? A. Possibly about 12 feet. Q. You were not going to stop until you had to. A. I stopped as quick as I could. Q. And when you saw you were going to shove him six or seven feet you held or pressed the button kinder fast, did you? A. Yes, sir; I apply it there to give warning so the other man can stop if possible. Q. You say he was not looking toward you? A. No, sir. Q. And you run 12 feet before you attempted to stop the engine? A. I was giving him warning. Q. Did you run 12 feet when you discovered him in danger before

you stopped or attempted to stop it? A. I could not say. Q. That is your best judgment? A. Possibly a little over that. Q. If you had have applied the emergency as soon as you discovered the danger, you would not have hit him, would you; take your own statement, you would not have hit him would you? A. Well, no; not according to that."

An examination of the foregoing testimony of the engineer will show that this feature of the case was injected by the defendant, no objection being interposed by plaintiff. It would be manifestly unfair to permit defendant to open up a feature of the case not raised by the pleadings, and then allow him to claim an error because the court charged the jury the law thereon.

The case at bar is very similar to the facts in the Martin Case, *supra,* with the exception that the facts favor the plaintiff much more strongly here than in the Martin Case. Here the engineer testifies that he saw and appreciated plaintiff's danger when he was about 70 feet from the crossing, and while he testifies further that he sounded the whistle and applied the brakes in the quickest possible manner, and that he could not have stopped the engine sooner under the circumstances, yet the testimony of other witnesses strongly challenges the testimony of the engineer all along the line, and especially upon the point as to his conduct after he discovered the peril of plaintiff. While there is other substantial evidence on the part of the plaintiff sufficient to put this question to the jury, yet it is apparent that the testimony of Brakeman Parker contradicts the engineer on many vital points as to the efforts of the engineer to avoid injuring the defendant after he discovered his peril. It is true that this witness is a son of the plaintiff, but that fact will not of itself discredit his evidence; but the jury must consider

it like they would evidence from any other source, and give it such weight as they deem it entitled to. This witness testified, in part, as follows:

"Q. What is your name? A. J. M. Parker. Q. What is your father's name? A. George R. Parker. Q. Is he the plaintiff in this case? A. Yes, sir. Q. Where were you on or about 1 o'clock the 9th day of January, 1913? A. In Calvin, doing station switching. Q. Did you see your father about that time? A. Yes, sir. Q. Did your father get bumped or knocked off an M., O. & G. engine that day? A. Yes, sir. Q. Where was the engine coming from? A. From the oil mill. Q. How far is the oil mill from where it struck your father? A. About a quarter of a mile. Q. Where were you? A. In the back end of the tender. Q. Coming from the oil mill as you approached main street in the town of Calvin, what rate of speed was the engine going? A. About ten miles an hour. Q. Was the bell ringing or the whistle blowing? A. Yes, sir. Q. At that time? A. When I gave him the stopping signal and hollered at him, he rang the bell and blew the whistle. Q. How far was he when he struck your father, when you gave him the stopping signal? A. About ten feet. Q. When was the first time he blew the whistle or rung the bell? A. When I hollowed at him and gave him the stopping signal. Q. Did you observe the engineer, or was he looking down the track when you hollered at him? A. No, sir; I could not see him at all backing the engine. Q. Had either the bell rung or whistle blown until after you gave him the stopping signal? A. No, sir. Q. When the engine struck your father, how, which way was he going? A. He was going north toward the Rock Island depot. Q. How was he going? A. In a wagon. Q. When the engine struck the wagon, how far did it slide or push the wagon? A. Six or seven feet. Q. And you were approaching the main street crossing at the time of the accident? A. Yes, sir. Q. The rear of the engine was nearest the crossing as you came down? The tender where you were standing? A. Yes, sir. Q. Then you

were the closest man on the engine to the crossing? A. Yes, sir. Q. Your view was absolutely unobstructed by anything? A. I did not see anything at all. Q. Now, as you neared the crossing, then you say you saw your father in the wagon? A. Yes, sir; I was about a car length of him. About a car and a half, or two cars. Q. Then you were about 50 or 60 feet of him? A. Yes, sir. Q. How far from where your father was struck did you have an unobstructed view, or could you have seen? A. Two car lengths. Q. A car is about how long. A. About 30 feet. Q. Now, how wide, Mr. Parker, if you know, is the main street of the town there from, say, the hotel sidewalk to the sidewalk on the other side? A. I don't know."

The engineer has testified that he saw plaintiff about to go upon the track, when he was 70 feet from the crossing, and at once gave the signal and applied the brakes. The plaintiff's son says that the first time he blew the whistle or rang the bell was when he was within ten feet of the plaintiff. Then if that be true, and the engineer's testimony also be true that he saw the plaintiff 70 feet from the crossing and blew the whistle before he applied the brakes, the engine went about 60 feet after the engineer discovered the peril of the plaintiff without his doing anything to avoid injuring him.

Defendant insists that the engineer was mistaken in judging of the distance intervening between where he was when he first saw plaintiff and where he was struck. That may be true, but this was a matter for the jury to consider, as well as the credibility and accuracy of all the witnesses, including plaintiff's son. Several other witnesses also testify that the engine was much nearer the crossing than 70 feet when the whistle was first blown, and upon this basis defendant argues in its brief that as the engineer testified that he blew the whistle

as soon as he saw the peril of plaintiff, and some of the witnesses upon the part of plaintiff testified that the whistle was not sounded until the engine was within ten to twenty feet of the plaintiff, it follows that the engineer was mistaken in his judgment of the distance, and that he really first saw the plaintiff when he was only this distance, to wit, from ten to twenty feet away, when it would be conceded it was too late to stop the engine before the contact.

While there is not any direct expert evidence in the record showing in what space the engine could have been stopped under the conditions at the time of the accident, yet in view of the testimony of the engineer that he discovered plaintiff when he was about 70 feet from the crossing, coupled with the testimony of other witnesses that the engine was stopped in a much shorter space after the engineer did attempt to stop it, we think the court's action in charging the jury upon the doctrine of discovered peril was proper. *M., K. & T. R. Co. v. Horton*, 28 Okla. 815, 119 Pac. 233; *Clark v. St. Louis & S. F. R. Co.*, 24 Okla. 764, 108 Pac. 361; *Oklahoma City R. Co. v. Barkett*, 30 Okla. 28, 118 Pac. 350; *St. Louis & S. F. R. Co. v. Kral*, 31 Okla. 624, 122 Pac. 177; *Chicago, R. I. & P. R. Co. v. Martin*, 42 Okla. 353, 141 Pac. 276; *Atchison, T. & S. F. R. Co. v. Baker*, 21 Okla. 51, 95 Pac. 433, 16 L. R. A. (N. S.) 825.

Defendant next urges that the doctrine of discovered peril could not in any event apply, for the reason that, if plaintiff's contributory negligence continues up to the moment of the accident to him, the doctrine of discovered peril never applies. Elliott on Railroads, vol. 3, p. 1175 (2d Ed.); *Gilbert v. Missouri P. R. Co.*, 91 Kan. 711, 139 Pac. 380; *Dyerson v. Union P. R. Co.*, 74 Kan. 528,

87 Pac. 680, 7 L. R. A. (N. S.) 132, 11 Ann. Cas. 207; *Dunlap v. Chicago, R. I. & P. R. Co.,* 87 Kan. 197, 123 Pac. 754; *Coleman v. Atchison, T. & S. F. R. Co.,* 87 Kan. 190, 123 Pac. 756; *Smith v. Norfolk & S. R. Co.,* 114 N. C. 728, 19 S. E. 863, 923, 25 L. R. A. 287; *Porter v. Missouri P. R. Co.,* 199 Mo. 99, 97 S. W. 880; *Chesapeake & O. R. Co. v. Hall,* 147 Ky. 12, 143 S. W. 749; *Maryland C. R. Co. v. Neubeur,* 62 Md. 391; *Guilmont v. Central Vermont,* 78 Vt. 185, 62 Atl. 54; *Wabash R. Co. v. Tippecanoe Law & Trust Co.,* 178 Ind. 113, 98 N. E. 64, 38 L. R. A. (N. S.) 1167; *Melzner v. Northern P. R. Co.,* 46 Mont. 162, 127 Pac. 146; *Clark v. St. Louis & S. F. R. Co., supra.*

We have not been able to find that our own court has passed upon this point; but it is here unnecessary to pass upon that proposition, because the evidence does not show any contributory negligence upon the part of plaintiff after he (the plaintiff) discovered his peril. Defendant's testimony shows that he (the plaintiff) was looking west at all times until he was upon the track, and did not look east towards the engine until after the signal was given, when he looked east and at once tried to stop his team, which was coming at a brisk walk down a sharp incline, and the testimony of the plaintiff upon this point was that he did not see the engine until it was almost upon him, and he was struck so soon after he realized his position he did not have adequate time to escape.

The defendant in this case seems to have accepted all of the rulings of the court upon the admission of testimony as correct, but contends vigorously and with ability that almost every line of the instruction was radically wrong.

We have tried to examine and discuss the main objections urged, but to cover all of them herein would prolong this opinion to a great length. We have given consideration to every point urged and find no material error in the entire instruction.

We have also considered the set of instructions offered by the defendant, and, in the main, no objection can be successfully urged against them; but they cover almost the same points as covered by the general instructions, and instructions should not be duplicated, and, even though a presented instruction be sound and applicable to the case, it should not be given if covered in substance by correct instructions in the main charge, and we find no error in the court's refusal to give any of the requested instructions.

This brings us to the final question presented, and that is: Was the verdict excessive? We are unable to reach any other conclusion than that it is evidently excessive.

In the case of *Independent Cotton Oil Co. v. Beacham*, 31 Okla. 384, 120 Pac. 969, the plaintiff was a boy, 20 years of age, and received an injury which resulted in the necessary amputation of his right leg immediately below the knee. The jury allowed a verdict of $25,000, which was approved by the trial court; but the same was affirmed by this court only upon condition that it be reduced to $10,000.

In the case of *St. Louis & S. F. R. R. Co. v. Hart*, 45 Okla. 659, 146 Pac. 436, a man 48 years of age received an injury, and amputation above the ankle of one leg was necessary. A judgment for $10,000 was by this court held to be excessive, and a *remittitur* down to $5,000 was ordered.

We recognize the rule laid down in *Choctaw, O. & G. P. Co. v. Burgess,* 21 Okla. 653, 97 Pac. 271, as follows:

"Appellate courts should sparingly exercise the power of granting new trials on the ground of excessive damages, and only when it appears that the verdict is so excessive as *per se* to indicate passion or prejudice."

In the instant case, the plaintiff was a man 54 years of age, who had been in good health prior to the accident and was engaged in the occupation of drayman and earning $50 per month. The plaintiff was not hit by the engine, but was struck by one of the wheels of the wagon as he jumped off of the rear end of the wagon; the wheel being knocked loose from the wagon and hitting the plaintiff. At that time, no very serious injuries were apparent or complained of. He says his foot was mashed, but it was more of a bruise or sprain, and not very serious at the worst. His physician testified that his hip was injured by a possible part dislocation, and the evidence as to this is not very certain and sharply controverted, and there was also a slight wrench of the back complained of afterwards. The plaintiff after the accident went to see a doctor in the town who found the foot bruised and a slight swelling, and at that time no complaint was made by the plaintiff of any other injury. He was able to walk to the doctor's office unassisted, and after the doctor had bathed the foot in hot water and applied an ointment to it he walked home. At the time of the trial, some two months afterwards, it appears that the plaintiff was seriously ill and was unable to attend the same. There was much conflicting evidence as to what malady he was suffering with at the time of the trial. He contended that, after he got home from the doctor's office after the accident, he went to bed and had ever since suffered from injuries to his hip and back

received by him at the time of the accident, which state-- ments were corroborated by his physician.

Defendant contended, and introduced substantial evidence to the effect, that plaintiff's present condition was not caused by the injuries received at the time of the accident, but that he had contracted a severe case of la grippe, and was troubled by piles in an aggravated form, and that he was in a bad condition as a result of the piles and la grippe.

Accepting plaintiff's theory as true, that his then present condition was a direct result of the injuries received, we are not able to reach any other conclusion than that the verdict was grossly excessive.

If the plaintiff, defendant in error here, in 30 days after mandate is filed in the trial court, will file a *remittitur* of all of the judgment in excess of $6,000, the judgment will be affirmed, with costs. If the *remittitur* is not filed within the time allowed, the cause will stand reversed and remanded for a new trial.

By the Court: It is so ordered.