### SHARUM v. SHARUM.

No. 11989—Opinion Filed June 14, 1921.

Rehearing Denied July 19, 1921.

(Syllabus.)

1. **Pleading—Motion to Make Definite and Certain—Requisites.**

Where a motion to make a petition more definite and certain and to separately state and number the facts supposed to constitute each separate and distinct cause of action, so that the court may act intelligently thereon, is filed, and said motion fails to, in any manner, point out wherein said petition is indefinite and uncertain, it is not error to overrule such motion.

**2. Trial—Demurrer to Evidence—Consideration.**

In passing upon a demurrer to the evidence, the court does not weigh the evidence. The demurrer admits every fact which the evidence in the slightest degree tends to prove and all inferences and conclusions that may be reasonably and logically drawn from the same, and, where there is any conflict in the plaintiff's evidence that would make any part of it unfavorable to plaintiff or sustain the defense, the court, in passing upon such demurrer, should consider such evidence withdrawn.

**3. Trial—Motion to Direct Verdict—Consideration.**

A motion to direct a verdict admits all the facts and inferences to be drawn therefrom in favor of the party against whom the motion is directed, and leaves for consideration only such evidence as is favorable to the party against whom such motion is directed.

**4. Same—Province of Jury—Questions of Fact.**

Where, after disregarding all evidence tending to sustain the defense, there is any evidence from which an inference favorable to the plaintiff may be reasonably, although not necessarily, drawn, the court will not invade the province of the jury by withdrawing from it the right to pass on the facts to be deduced from such inference.

**5. Appeal and Error—Review—Questions of Fact—Verdict.**

In a civil action triable to the jury, where there is competent evidence reasonably tending to support the verdict of the jury, and no prejudicial errors of law are shown in the instructions of the court, or its ruling on law questions presented during the trial, the verdict and the finding of the jury will not be disturbed on appeal.

**6. Assault and Battery—Action for Damages Against One Instigating—Judgment—Affirmance.**

Record examined, and held, that the judgment of the trial court should be affirmed, and it is so ordered.

Error from District Court, Muskogee County; E. A. Summers, Judge.

Action by Allie Sharum against A. H. Sharum for damages for instigating assault and battery. Judgment for plaintiff, and defendant brings error. Affirmed.

W. J. Crump, R. P. deGraffenreid, and Myron White, for plaintiff in error.

Harry G. Davis and Neff & Neff, for defendant in error.

JOHNSON, J. On the first day of May, 1920, Allie Sharum, as plaintiff, commenced an action against A. H. Sharum, as defendant, to recover the sum of $50,000 ac-

tual, and $100,000 exemplary, damages, which cause was tried to the court and jury on October 13, 1920, resulting in a verdict and judgment in favor of the plaintiff in the sum of $15,000, to reverse which this proceeding in error has been regularly commenced.

For convenience, the parties will hereinafter be referred to as plaintiff and defendant, respectively, as they appeared in the trial court.

Omitting the formal parts thereof, the plaintiff's petition alleged as follows:

"For cause of action against the defendant, plaintiff states and alleges; that Julian Sharum is a son of the defendant, A. H. Sharum; that this plaintiff and said Julian Sharum were lawfully married at Atoka, Oklahoma, during the month of July, 1906; that as a result of said marriage two children have been born, their names being Vernor Sharum, 12 years of age, and Albert Sharum, 6 years of age; that at the time plaintiff and said Julian Sharum were married, and at various times since said marriage, the said Julian Sharum was and has been the owner of various pieces of property located in the city of Muskogee, Oklahoma, and had interest in other property located at various places in the state of Oklahoma; that shortly after said marriage the defendant, A. H. Sharum, commenced to work upon said Julian Sharum for the purpose of obtaining from Julian Sharum all the property he then had and to convert the same to the use and benefit of the defendant, A. H. Sharum, for the purpose of depriving this plaintiff of any use or enjoyment thereof, and for the purpose of alienating the affections of the said Julian Sharum from this plaintiff and to induce him to abandon her; and the said A. H. Sharum and Julian Sharum conspired together to get rid of this plaintiff so that they would not have to allow her any part of said property to be used and enjoyed by her for the support of herself and her children by the said Julian Sharum; that the defendant, A. H. Sharum, at all times since the marriage above mentioned had and exercised an undue influence and control over the said Julian Sharum and persuaded him to convey to the said A. H. Sharum all of the property owned or held by the said Julian Sharum under a purported agreement whereby the said A. H. Sharum was to support the said Julian Sharum and his family during the life of him and said Julian Sharum and during the lives of the children of this plaintiff and said Julian Sharum; that the said Julian Sharum, believing that said agreement would be performed and being overpersuaded and overreached by the defendant, A. H. Sharum, conveyed all his property to the defendant, A. H. Sharum; that during the month of November, 1917, for the purpose of bringing about a separation between this plaintiff and the said Julian Shar-

um, and for the further purpose of aiding him, the said A. H. Sharum, to secure from the said Julian Sharum all his property and effects, the said A. H. Sharum induced and persuaded the said Julian Sharum, then the husband of this plaintiff, to leave plaintiff and the two minor children herein named and he, the said defendant, took the said Julian Sharum into his home and has ever since kept him there away from this plaintiff and said children; that the said defendant, A. H. Sharum, has a beautiful home and bestows upon the said Julian Sharum and did bestow upon him the said Julian Sharum, from the month of November, 1917, all the comforts and luxuries of life but that at said time and ever since said time, to wit, November, 1917, the said A. H. Sharum has refused admission to said home to this plaintiff or to the children of plaintiff and the said Julian Sharum, and has repeatedly and by force and threats driven the said children of this plaintiff and the said Julian Sharum, away from his home and the shelter he offered and bestowed upon their father; that the said A. H. Sharum insisted that the said Julian Sharum should remain at the home of the defendant and away from the plaintiff and her children and should not assist them in their support for the reason that by so doing he, the said A. H. Sharum, would be better able to control his son and prevent this plaintiff from sharing in any way in the property justly and rightfully due said Julian Sharum; that while plaintiff and the said Julian Sharum lived together the said Julian Sharum provided a home, clothing and food for plaintiff and her two children, but that after the said Julian Sharum was taken into the home of the defendant, this plaintiff and said two children were left in a destitute condition without a home, clothing and without food and that this plaintiff and her children were forced to rely upon charity for several months and that from the said month of November, the said Julian Sharum, owing to the influence and control exercised over him by the defendant, A. H. Sharum, has failed and refused to contribute anything whatsoever towards the support of the plaintiff and said children.

"Plaintiff further states that the said defendant A. H. Sharum, after almost two years of interference with plaintiff and her husband and the said minor children and in denying plaintiff access to the home in which her husband was kept and in denying his own grandchildren the right and privilege of visiting their own father had failed to induce this plaintiff to abandon her right of support, he, the said A. H. Sharum, advised, directed and coerced the said Julian Sharum, his son, and who was under his control, to beat and otherwise injure this plaintiff and to put her in fear of her life, and under said advice, direction and coercion, he, the said Julian Sharum, did beat and otherwise injure this plaintiff and did put her in fear of her life, for the purpose on

the part of him, the said A. H. Sharum, to compel her, this plaintiff, for the protection of her life and that of her children to procure a divorce from the said Julian Sharum; that after the said Julian Sharum pursuant to the direction, advice and coercion of the defendant, A. H. Sharum, had gone to the place where this plaintiff and her said children were staying, had struck plaintiff with his fist, knocked her down, bruised her face and body, kicked her and threatened to kill her, the said A. H. Sharum told this plaintiff that Julian Sharum, his son, would probably kill her if she did not get a divorce from him and plaintiff was thereby put in great fear and did bring suit for divorce against the said Julian Sharum; that in said suit the defendant, A. H. Sharum, employed an attorney and took charge of the defense of said suit; that in said divorce suit this plaintiff was awarded the sum of $40.00 per month alimony but that the said defendant, A. H. Sharum, then and there told this plaintiff that she would never receive a dime, and he, the said A. H. Sharum, has prevented the said Julian Sharum from paying any of the said alimony and has often boasted that he would prevent Julian Sharum from ever paying this plaintiff anything recovered by her under said judgment; that the said defendant during all of said time that the plaintiff and Julian Sharum were married has been actuated by greed and avarice and has acted wantonly and maliciously towards this plaintiff and should be required to pay large exemplary damages; that said defendant, A. H. Sharum, has property and money to the value of at least four hundred thousand dollars and that he is the stingiest man in the state of Oklahoma; that the plaintiff has endured great suffering and great mental pain, has been compelled to support herself and two minor children upon eight dollars per week out of which she also had to pay house rent; that she and her children have on many occasions gone hungry and have been without proper clothing and have suffered bitterly from the cold; that she has been put in fear of her life and has greatly suffered therefrom on account of the wanton, unlawful and malicious acts on the part of the defendant herein, that plaintiff has suffered actual damages in the sum of fifty thousand dollars, and that she is entitled to recover in addition to the actual damages so suffered, the sum of one hundred thousand dollars, as punitive damages.

"Wherefore, plaintiff asks judgment against the defendant, A. H. Sharum, in the sum of one hundred fifty thousand dollars, together with all costs and all other proper relief."

To this petition, the defendant filed a motion in the following language:

"1st. That said plaintiff be required to separately state and number her separate causes of action, if more than one cause of action is intended to be stated in her petition.

"2nd. That plaintiff be required to amend her petition with allegations sufficiently specific and intelligible that defendant may know what kind of an action plaintiff has attempted to state."

This motion was overruled by the court and exceptions saved. Thereupon the defendant filed his answer, admitting that the parties were both residents of Muskogee, and that Julian Sharum was his son, and that said son and plaintiff were legally married and had born to them as the fruits of said marriage the two children as alleged in the plaintiff's petition, and that the plaintiff had been divorced from the said Julian Sharum, and for further answer denied generally each and every allegation contained in plaintiff's petition.

The defendant's petition in error contains 34 specifications of error, the first of which is that the court erred in overruling motion of plaintiff in error for new trial; second, overruling motion to require plaintiff to separately state and number her causes of action; third, and fourth, overruling the motion to make said petition more definite and certain. Specifications 5, 8, 9, 10, 11, and 12, go to the question of the admission of testimony over the objection of the defendant; and 13, error in not sustaining defendant's demurrer to the evidence of the plaintiff; 26 and 27, errors of law occurring at the trial and excepted to by the defendant; 28, that the amount recovered is excessive; 29, the verdict of the jury is contrary to law; 30, that the verdict is contrary to the evidence; 31, is contrary to both the law and the evidence; 32 and 33, misconduct of counsel for the plaintiff; 34, error in not permitting counsel for defendant to make certain statements to the jury as to contents of plaintiff's petition; and the other specifications go to the giving of certain designated instructions to the jury and refusing to give certain designated requested instructions of the defendant.

The record discloses without dispute that the marriage of the plaintiff to the defendant's son, Julian Sharum, was a very unfortunate, as well as an unhappy, marriage, and that such unhappiness began immediately following their marriage in 1906; that the said Julian Sharum, at the time of the marriage and during all the time that he and plaintiff lived together as husband wife, covering a period of about ten years, was a common drunkard and dope fiend, being habitually addicted to the uses of intoxicating liquors to excess and cocaine; that never during their married life did he do a single day's work or contribute a single dollar earned by him to the support of himself and his wife and their children; that, a short time before their marriage, there was standing in his name title to certain lots in the city of Muskogee that were scheduled to him at the instance of his father; that his father claimed town property largely in excess of what he was able to hold and secure title to under the federal townsite laws, and that his father scheduled numerous lots to his wife and other members of the family for the reasons stated, and that a short time before plaintiff's said marriage, she accompanied Julian Sharum to Hot Springs, Arkansas, where he was treated in a sanitarium for the whisky and drug habit, and at another time after their marriage he was placed in such sanatarium for said purposes, and that before going there, the testimony shows, his father required him to deed said town lots to him for a recited consideration of $880 paid, and the testimony shows that the further consideration was the assumption by the grantee of a certain mortgage then upon the premises which the said Julian Sharum had theretofore placed upon the same in order to obtain money from the bank to pay his expenses at the sanatarium, and that thereafter he was sent to and treated in a sanatarium in Kansas City, Mo., from which he received no permanent benefit, and was later sent to the asylum at Norman, where he remained for eight months, which treatment resulted in a cure for the drug habit, but that as a result of his habits and treatment therefor he became almost totally deaf.

The testimony showed that his father and mother, and brothers assisted to some extent, financed his treatment as aforesaid, and that during this period, covering ten years or thereabout, the plaintiff and her husband and their children lived in humble homes, consisting part of the time of a house of two and three rooms, both of which, in some way not explained by the record, were destroyed by fire, leaving the family destitute; but during all these years of trouble the plaintiff was industrious in her habits, and worked for a wholesale grocery store in the coffee department, beginning at a salary of $6 per week, which was gradually increased to $9, which was augmented up to the year 1917, when Julian's mother died, by contributions of weekly payments of $4 contributed by Julian's father, the defendant, and the mother of Julian, during her lifetime, contributed in different ways to the support of the children. The exact amount of such contribution is not clear from the record, and concerning which the testimony of the parties and other witnesses is more or less conflicting.

During the year 1917, the plaintiff brought suit for and obtained a divorce from her husband and was awarded the custody of the minor children and alimony in the sum of $40 per month, and at which time the plaintiff's husband took up his domicile at the home of his father, the defendant, and the plaintiff placed her youngest child for a time with the local united charities, and later sent the child to reside with a brother of the plaintiff at Atoka, Oklahoma; and the plaintiff secured one room in the attic or third story of a rooming house, which she and the oldest child occupied for sleeping, eating, and living quarters, and it was while living there that the alleged assault upon her was made, about which she testifies as follows:

"Q. Where were you living, Mrs. Sharum, in December—on December 31st, last year? A. 504 Columbus, where I live now. Q. Did you see Julian at that time? A. Yes, sir. Q. Explain to the jury what happened that day. A. He came down that night at my home, 504 Columbus, called me to the door—I w s upstairs in my room—he seized me by the throat and grabbed me and choked me—. Q. Don't tell any conversation—just tell what he done. A. He choked me and beat me with the butt end of a buggy whip all over the side of face until I was black and blue and knocked me down until I didn't know anything—I was unconscious for a few minutes. Q. As a result of that other, that unconsciousness, what was your physical condition? A. I wasn't able to work for three weeks. Q. Was you in bed? A. Yes, sir. Q. Now, you say you were in bed for three weeks? A. Yes, sir. Q. Were you able to work, Mrs. Sharum? A. No, sir; I was not. Q. What was your bill of fare, or what did you have to eat at that time? A. Very little—bread and butter —jelly and coffee. Q. Were you able to buy anything else? A. No, sir; I was not. Q. Now, after that time, did you see Mr. Sharum? A. Yes, sir. Q. Where? A. At the police court. Q. At the police court? A. Yes, sir. Q. Did you have any conversation with him? A. Yes, sir. Q. Did you hear any conversation between Mr. Sharum and anyone else at that time other than yourself? A. Did I what? Q. Just tell what conversation you heard Mr. Sharum have at the police court. A. Well, first, when I went up there—when I went up there to have Julian arrested—while I was on the witness stand about the first thing Mr. Sharum said to me—Mr. A. H. Sharum said, 'why don't you get a divorce', and I said I didn't want to. Q. What did he say? A. 'Why don't you get a divorce'; and I said, 'I don't want to'. Q. That was while you was on the witness stand telling about Julian beating you up? A. Yes, sir. Q. What did you say? A. I said I didn't want any. Q. Then what did he say? A. He asked me why I came back from Colorado. Q. Now, then, after that did you hear any conversation between Mr.

Sharum and any one else? A. Myself; yes, sir. Q. What was that? A. Out in the hall— Q. Before you got out in the hall was there anything said? A. Yes, sir. Q. What was said there? A. Well, Judge Zick said, 'Mrs. Sharum, what do you want me to do;' and I said, 'Put him in jail'; and Mr. Sharum said, 'I want to pay his fine'; and Judge Zick said, 'I don't want him to do that, I think I better put him in jail'—he says, 'he is liable to go down there and do that again'; and Mr. Sharum said, 'No, no, he will do whatever I tell him to do'. Q. After that did you leave the court room? A. Yes, sir. Q. Did you see Mr. Sharum? A. Yes, sir. Q. Where? A. Out in the hall. Q. Did you have any conversation with him? A. Yes, sir. Q. Tell the jury what was said there in that conversation. A. I walked up to Mr. Sharum and asked him why he sent Julian down there to beat me up that way, and I showed him the black places on my face and neck—Q. Before that had you learned that Julian had been sent down there? A. He said they sent him down there—Q.What did you say to him? A. I said, 'Why did you send Julian down there to beat me up this way', and showed him the side of my neck. He said: 'Yes, I sent him down there to give you a good beating — that is what you deserved, and if you don't get that divorce he is liable to kill you. The next time you will get a good deal worse than that.' Q. Then what did you do? A. I went home and went to bed. Q. State whether or not you were afraid of Julian after that? A. Yes, sir; I was afraid of him—I was afraid to get outside of the house. Q. Did you after that start suit for divorce? A. Yes, sir; right after that. Q. Would you have started suit for divorce had you not been afraid? A. No, sir; I didn't want any. Q. Did you obtain a divorce? A. Yes, sir. Q. Did you obtain the custody of the children? A. I did. Q. Did you obtain any alimony? A. I was supposed to get ten dollars a week. Q. Now, at the time you had your divorce case, who was the lawyer against you? A. Mr. Rampendahl. Q. Who was with Mr. Rampendahl, if any one? A. Mr. Sharum. Q. Did Julian Sharum seem to take part in the divorce proceeding? A. No, sir. Q. Where was he? A. Sitting back in the back end of the house—he didn't have nothing to say. Q. After the divorce was granted, did you see Mr. A. H. Sharum? A. Yes, sir. Q. Where? A. In the court room. Q. Did you have any conversation with him? A. Yes, sir; he said something to me. Q. Tell what did he say? A. He said: 'You get your divorce now, and that will be all you will ever get—' Q. Yes? A. And then he used an oath—shall I tell you what he said? Q. Yes. A. He said: 'You shall never have a damn cent of alimony.' Q. Have you ever received any alimony since? A. No, sir."

J. H. Brown, a police officer, testified: "Q. Have you been sworn? A. Yes, sir. Q. State your name. A. J. H. Brown. Q.

Where do you live, Mr. Brown? A. Muskogee, Okla. Q. Did you occupy any official position on December 31st, last? A. Yes, sir. Q. What were you? A. Police officer. Q. As such police officer, did you make an arrest of Julian Sharum? A. Yes, sir. Q. Where? A. At his father's house. Q. Was his father present? A. Yes, sir. Q. Did you hear any conversation or hear Julian Sharum make any statement to Mr. A. H. Sharum, at the time of the arrest? Answer yes or no. A. Any statement? Q. Did you hear any conversation between them? A. I heard one or two words. Q. Tell what Julian Sharum said, if anything. A. He said to his fa__er, 'I only did what you told me to do.' Q. Did you tell him what you had arrested him for? A. Yes, sir. Q. And then that remark was made in answer to that? A. Yes, sir."

Mrs. Linder testified:

"Q. Were you living there on December 31st, last year? A. Yes, sir. Q. Were you there when there was trouble between Mrs. Sharum and Julian Sharum? A. Yes, sir. Q. Now tell the jury what took place, if you know. A. Well someone came down there—of course, I didn't know whether it was him or not—I didn't see him—he hit her over the head with some kind of club— Q. Just tell the effect. A. She was hit over the head and a big knot on her head— choked her—a big red mark on her throat. Q. Did you hear any noise? A. I heard her scream. Q. What did you do? A. I ran out there to see what was the matter. Q. What was her condition? A. She was crying and all nervous and her face was all bloody. Q. Was she in her right mind? A. No, she was not. Q. What was her physical condition after that? A. Well, she just had a collapse, broke down; we had to put her to bed. Q. Was she able to work? A. No. Q. How long was she sick? A. About three weeks after, before she was able to go to work. Q. Was all of her children living with her at that time? A. Yes, sir. Q. Both of them? A. Yes, sir. Q. Mrs. Linder, did you afterwards call with Mrs. Sharum at the police court? A. I did. Q. Did you hear any conversation at the police court by Mr. Sharum with any one? A. Yes, sir. Q. What did you first hear? A. Well, I heard Judge Zick ask—'Let's send Julian to jail;' and he said: 'Oh, no; I don't want him sent to jail; I will pay his fine.' Q. What was said after that? A. And he said, 'He may go down there and do the same thing over again if we don't send him to jail;' and he said: 'No he won't; he will do just what I tell him to do.' Q. You said 'he'; who do you mean by 'he'? A. Mr. Sharum. Q. What did Mr. Sharum say? A. He said: 'No he won't; he will do just whatever I tell him to do.' Q. Now, after that, did you see Mr. Sharum? A. Yes, sir. Q. Where? A. Out in the hall. Q. Did you hear any conversation with Mr. Sharum by anyone there? A. Mrs. Sharum and he. Q. Now tell the jury what that was. A. Well, Mrs.

Sharum and I went out in the hall; he come out there, and she asked him why he 'had Julian come down there and beat' me like that,' and he said: 'Yes, I had him come down there and beat you. I will have him beat you again if you don't get that divorce I have tried to get you to get for years'. Q. Mrs. Linder, do you know whether or not Mrs. Sharum has had sufficient clothing or not, during the past two years? A. She has not. Q. Has (have) her children had sufficient clothing? A. They have not."

This testimony was disputed in part by the testimony of the defendant.

The first specification of error discussed by counsel is the overruling of the defendant's motion requiring the plaintiff to separately state and number her causes of action and to make the same more specific and certain, concerning which counsel say in their brief:

"We confess, frankly, that at the time we filed this motion, we were unable to determine to our own satisfaction just what kind of an action plaintiff had intended to state in her petition. The petition is set out in full, supra, and it contains some of the allegations or elements necessary to the stating of some three or four different kinds of actions, but as we did not know what kind of an action was intended to be stated we could not point out more definitely or specifically than we did in this motion what the defendant complained of. After a careful examination of this petition, however, which is the most remarkable one we have ever examined, we reached the conclusion that if it stated any cause of action, it charged the defendant with having alienated the affections of the plaintiff's husband, and upon trial of the case as suggested, supra, it was tried by the plaintiff, her attorneys and the court, upon the theory that it was an alienation suit, but was submitted to the jury by the court on the theory that it was a suit for damages for assault and battery.

"This petition being in the form that it was, we concluded, and are still of the opinion, that the proper thing for the defendant to do was to file the motion to make more definite and certain as set out, supra."

Section 4739, Rev. Laws 1910, provides:

"Where the petition contains more than one cause of action, each shall be separately stated and numbered."

We think this assignment is without merit. The question raised by this assignment was before this court in the case of Kuchler et al. v. Weaver, 23 Okla. 420, 100 Pac. 915, wherein Williams, J., speaking for the court, said:

"As to whether or not there was error in overruling the motion of the defendant to

require the plaintiff to separately state and number his causes of action, we will now determine. In the case of Grimes et al. v. Cullison, 3 Okla. 269, 41 Pac. 355, it is held that where a motion to make a petition more definite and certain is filed, and said motion fails to in any manner point out wherein said petition is indefinite and uncertain, it is not error to overrule such motion. To the same effect are the cases of Gilmore v. Norton, 10 Kan. 491 .(New Ann. Ed. 369), and Kerr v. Reece, 27 Kan. 338. In the case of Ambrose v. Parrott, 28 Kan. 699 .(New Ann. Ed. 498), the court held that a motion requiring different causes of action to be separately stated and numbered should in all cases point out specifically the matters which the parties filing same desire the court to act upon, designating the matter supposed to constitute each separate and distinct cause of action, so that the court may act intelligently; however, with the limitation that. in reviewing such matters, even by the appellate court, a discretion may be exercised."

We think that the instant case comes clearly within the rule there announced.

The second assignment of error discussed by counsel in their brief is:

"The court erred in overruling the objection of the defendant to the introduction of any evidence in this cause for the reason that no cause of action was stated in the petition which would entitle the defendant in error to a verdict and judgment or to relief prayed for in her petition, or to any relief of any kind."

We think this assignment is likewise without merit. The plaintiff's petition, when stripped of surplusage and unnecessary verbiage, states a cause of action against the defendant for an unlawful assault upon her by her former husband instigated by the defendant under such circumstances of aggravation and oppression as to show malice on the part of the defendant, that, if supported by the proof, would authorize a verdict for exemplary damages. This rendered the petition good against a general demurrur, had one been interposed, and it was upon these issues that the cause was submitted to the jury. Therefore, the trial court very properly overruled the defendant's objection to the introduction of any evidence on the part of the plaintiff because the petition failed to allege facts to constitute a cause of action in her behalf and against the defendant.

Defendant's assignments of error numbered 3 and 5 are related and will be considered together; No. 3 being that the court erred in submitting to the jury a cause of action for damages for assault and battery, and No. 5 is that the court erred in not sustaining the demurrer of plaintiff in error to the evidence

of the defendant in error at the close of the testimony of defendant in error. These assignments are without merit, as it is obvious from the testimony hereinbefore referred to and set out in detail, in part, that the same was amply sufficient to take the case to the jury upon both the questions of actual and exemplary damages; the rule being that under the practice and procedure in this state in trials by jury it is well-established law that, even though the testimony be undisputed, it should be so convincing that all reasonable men must draw the same conclusion from the facts proved before the court is authorized to sustain a demurrer to the evidence or direct a verdict. City of Durant v. Allen, 67 Oklahoma, 168 Pac. 205; St. Louis & S. F. Ry. Co. v. Hart, 45 Okla. 659, 146 Pac. 436; and many other decisions of this court of later date may be cited to the same import.

In the case of Singer v. Citizens' Bank of Headrick, 79 Okla. 267, 193 Pac. 41, this court said:

"In passing upon a demurrer to the evidence the court does not weigh the evidence. The demurrer admits every fact which the evidence in the slightest degree tends to prove and all inferences and conclusions that may be reasonably and logically drawn from the same, and, where there is any conflict in the plaintiff's evidence that would make any part of it unfavorable to plaintiff or sustain the defense, the court, in passing upon such demurrer, should consider such evidence withdrawn."

To the same effect, see Smith v, Rockett, 79 Okla. 244, 192 Pac. 691; Boatman v. Coverdale, 80 Okla. 9, 193 Pac. 974.

Specification of error No. 4 complained of the ruling of the court upon admitting and rejecting evidence over the objection of the defendant. This assignment is without merit. From an examination of the record it clearly appears that in this matter the court was far more liberal to the defendant than to the plaintiff, but it seems to have acted fairly toward each, and we find nothing in the ruling of the court in the matter complained of that in our opinion was in any way prejudicial to the rights of the defendant or that deprived him of any substantial statutory or constitutional right. Hence, for the reasons stated, this court has no authority to reverse the judgment of the trial court. Rev. Laws 1910, sec. 6005.

Specifications numbered 6, 7, and 8 go to the question of the instructions given by the court, and the requested instructions of the defendant refused by the court, and include practically every paragraph of the court's

instructions to the jury and requested instruction No. 1 of the defendant which was a peremptory instruction to the jury to return a verdict in favor of the defendant, and certain requested instructions which were given to the jury by the court, with slight modifications, and we think the instructions, as so modified, stated the proposition of law involved with reasonable accuracy, and that there was no error in giving the same, and that the instructions of the court as a whole were likewise reasonably fair and accurate statements of the law and are not subject to the criticisms sought to be made by the defendant. Hence, the objection of the defendant made thereto was not well taken, and was therefore properly overruled.

The remaining specifications argued by counsel in their brief go generally to errors of law occurring at the trial and urge the verdict of the jury is void, and the amount thereof excessive, and go to the following remarks of counsel for the plaintiff, William Neff, in his opening argument to the jury, wherein he said:

"Well, he might not have to support them under the law, but it is a' mighty mean man that wouldn't do it. By Mr. deGraffenreid: I object and ask Mr. Neff be required to stay inside the instructions of the court. By the Court: Let the record show the objection is overruled and the court finds he is within his right in arguing the question of punitive damage, of malice and wantonness."

Paragraph 7 of the court's instructions to the jury was as follows:

"You are instructed that a man is not under any legal obligations to support his daughter-in-law or his grandchild or grandchildren, and in this case you are instructed that the defendant, A. H. Sharum, was and is under no legal obligations to support the plaintiff, Allie Sharum, or her two children; and you cannot take into consideration any evidence upon this proposition in determining whether plaintiff is entitled to recover actual or exemplary damages, except as same may tend to prove or disprove malice or wantonness on the part of the defendant towards the plaintiff."

The record discloses that this instruction was requested by the defendant with the exception of the words, "Except as same may tend to prove or disprove malice or wantonness on the part of the defendant toward the plaintiff." The court's instructions, from his statement in the first paragraph to the close of the instructions, limited the plaintiff's right to recover actual damages sustained by her by reason of the assault and battery, and that only provided the jury should find that such assault and battery was instigated and caused by the defendant, and to exemplary damages, provided the jury should find that the defendant acted oppressively and with hatred and malice towards the plaintiff, and the instructions as a whole, we think, carefully safeguarded the rights of the defendant, and the remarks of counsel complained of, occurring as they did in the opening speech for the plaintiff, where defendant's counsel had ample opportunity to, and no doubt did, fully answer same in the light of the instructions given by the court that the defendant could not be required, under the law, to support his daughter-in-law and his grandchildren—in these circumstances we think it clear that the jury was not prejudiced by such remarks, and that they only gave such consideration thereto as they were authorized in view of the testimony and instructions of the court, and that no reversible error is apparent when the full record is considered.

Defendant's specification No. 11, given in brief of counsel, is that "The amount of recovery given the plaintiff is grossly excessive and was found and returned by the jury under the influence of passion and prejudice as is clearly shown in the record of this case;" and, after quoting at length from the testimony, counsel say in their brief:

"This was all the evidence regarding the assault and battery. We call the court's attention to the fact that Mrs. Sharum did not even testify to the amount of pain and suffering she underwent, if any. She was not injured to that extent that she even called a physician, at least the record does not show that she did call one. It is true that she says that after she had Julian arrested, she went home and stayed in bed three weeks, but, as a matter of fact, the evidence does not show that she was seriously injured in any way, and a judgment for $15,000.00, under the evidence in this case, admitting for the sake of argument that the defendant caused Julian Sharum to commit this assault and battery (which we do not believe is true), is so grossly excessive that it ought to show to any fair-minded person at a glance that the verdict of the jury was rendered under the influence of passion and prejudice."

In support of this contention, counsel cite the cases of M., O. & G. Ry. Co. v. Parker, 50 Okla. 491, 151 Pac. 325, Independent Cotton Co. v. Beacham, 31 Okla. 384, 120 Pac. 969, St. Louis & S. F. Ry. Co. v. Hart, 45 Okla. 659, 146 Pac. 436, and C., O. and G. Ry. Co. v. Burgess, 21 Okla. 653, 97 Pac. 271, where this court held the verdict for actual damages was excessive and required remittiturs reducing the amount thereof in each case to be filed.

In the Burgess Case, supra, in passing upon the question of excessive damages, this court announced the rule to be that:

"Appellate courts should sparingly exercise the power of granting new trials on the ground of excessive damages, and only when it appears that the verdict is so excessive as, per se, to indicate passion or prejudice."

We think this rule affords a proper criterion in such cases, and if we felt that the verdict in the instant case was the result of passion and prejudice of the jury, we would order the verdict set aside or a remittitur to be filed; but when it is so apparent from the record that the verdict was not the result of passion and prejudice on the part of the jury, we do not hesitate to sustain the same.

From an examination of the entire record, we are convinced that the parties were granted a fair and impartial trial; that the verdict of the jury was the result of great deliberation at the hands of the jury after analyzing the evidence, which it was the province of the jury to do, arising from a very unusual situation—so unusual, we think, as to be without parallel in the jurisprudence of the country. The jury was fully authorized to, and by their verdict did, conclude that the defendant, a man of immense wealth, instigated his son, who was completely under his control, to commit a brutal assault upon the plaintiff, his former wife, by beating her over the head with the butt end of a buggy whip and knocking her down, rendering her temporarily unconscious, such assault being entirely without provocation at the time the same was committed, and the uncontradicted evidence showing that the son went to the rooming house where the plaintiff resided in the attic, in the third story thereof, with her son, called her to the door, and when she appeared, assaulted her in the way and manner above stated.

We think the jury was warranted in finding that said assault was instigated by the defendant through malice and ill-will of defendant toward the plaintiff, and that the same was oppressive and fully warranted the jury in inflicting upon the defendant punishment as an example and warning to others to refrain from similar conduct toward the innocent and helpless wherever found.

We fail to see in these circumstances where the amount of this verdict should shock the conscience of any fair-minded man.

Finding no reversible error in the record, the judgment of the trial court is affimed.

PITCHFORD, W. C. J. and KANE, MILLER, and KENNAMER, JJ., concur.